IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH THE CELLULAR DEVICE ASSIGNED CALL NUMBER (978) 327-1161, WITH INTERNATIONAL MOBILE SUBSCRIBER IDENTITY NUMBER 310260956385010, THAT IS STORED AT PREMISES CONTROLLED BY T-MOBILE | Case No. 19-mj-262-01-AJ<br><br>**Filed Under Seal** |

### AFFIDAVIT IN SUPPORT OF
### AN APPLICATION FOR A SEARCH WARRANT

I, Matthew C. Boc being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.  I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 and 18 U.S.C. §§ 2703(c)(1)(A) for information about the location of the cellular telephone assigned call number (978) 327-1161, with International Mobile Subscriber Identity 310260956385010, with no listed subscriber name or address (the "Target Cell Phone"), whose service provider is T-Mobile, a wireless telephone service provider headquartered in Bellevue, Washington. The Target Cell Phone is described herein and in Attachment A, and the location information to be seized is described herein and in Attachment B.

2.  I am a Special Agent with the United States Drug Enforcement Administration "DEA" and have been since February 17, 2012. I have been assigned to the Southern New Hampshire Drug Enforcement Administration's High Intensity Drug Trafficking Area Task Force of the Boston Division of the United States Drug Enforcement Administration as a Special

1

Agent since February of 2018. Prior to joining the DEA I was a full time Police Officer in the State of New Hampshire for approximately nine years. My current duties and responsibilities include the investigation of possible violations of federal law, including violations of 21 U.S.C. § 841(a)(1) and 846.

3. Since joining the DEA, I have participated in twelve wiretap investigations and several other investigations where I analyzed telephone toll records and subscriber information. I have received significant training in the field of narcotics enforcement and investigations. Through my training, education, and experience, I have become familiar with the manner in which drug trafficking organizations ("DTOs") conduct their illegal activities, including purchasing, manufacturing, storing, and distributing narcotics, the laundering of illegal proceeds, and the efforts of persons involved in such activity to avoid detection by law enforcement. In the course of participating in investigations of drug distribution organizations, I have conducted or participated in surveillance, the purchase of illegal drugs, the execution of search, seizure, and arrest warrants, debriefings of subjects, witnesses, and confidential informants, and reviews of consensually recorded conversations, meetings, and Title III intercepts.

4. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

5. Based on the facts set forth in this affidavit, there is probable cause to believe that Doriel GUERRERO has violated 21 U.S.C. §§ 841(a)(1) & 846 – Possession with Intent to Distribute and Conspiracy to Distribute Controlled Substances. There is also probable cause to

believe that the location information described in Attachment B will constitute evidence of these crimes and will lead to the identification and location of those who committed them.

6. The court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711. Specifically, the Court is the United States District Court, District of New Hampshire: a district court of the United States that has jurisdiction over the offense being investigated, *see* 18 U.S.C. § 2711(3)(A)(i).

## **PROBABLE CAUSE**

7. Since June of 2019, the DEA has been involved in a criminal investigation of a Drug Trafficking Organization "DTO" engaged in the distribution of fentanyl in the greater Methuen, Massachusetts area in violation of 21 U.S.C. §§ 841(a)(1) & 846 – Possession with Intent to Distribute and Conspiracy to Distribute Controlled Substances.

8. In early June, 2019, GUERRERO, using the name "Freddy Banks", unknowingly contacted law enforcement on an undercover "UC" Facebook Account. GURERRERO explained to the undercover agent, in sum and substance, that he was looking for potential "business partners" to help distribute fentanyl. GUERRERO provided the UC with the phone number (603) 417-9122.

9. In Mid-August, 2019, law enforcement conducted a UC purchase of narcotics from the GUERRERO DTO. Utilizing the UC, law enforcement placed a call to telephone number (603) 417-9122, which was given to the undercover agent via Facebook by "Freddy Banks" to arrange the transaction. A male, later determined to be GUERRERO, answered the phone and the UC ordered a "sample" or a small amount of, "Fire Down" or high quality fentanyl. GUERRERO agreed to sell 10 grams of fentanyl for $220. GUERRERO told the UC

to meet him at a restaurant at the Loop in Methuen. Upon arrival, the UC again spoke with GUERRERO and advised him that he had arrived.

10. A short time later, under the supervision of law enforcement, GUERRERO entered the parking lot of the restaurant operating a dark gray Lexus and parked in the parking lot. Law enforcement observed GUERRERO enter the restaurant and exit the other side of the building approximately three minutes later. GUERRERO approached the UC's vehicle and made the exchange of 10 grams of fentanyl for $220 in Official Advance Funds (OAF). GUERRERO then returned to his vehicle and left the area.

11. The registered owner of the Lexus is listed as Ana PENA-RAMIREZ of 56 Strathmore Road in Methuen, Massachusetts. Open source databases show that in April of 2019, GUERRERO listed 56 Strathmore Road in Methuen, Massachusetts as his own address.

12. The Methuen Police Department assisted in identifying GUERRERO utilizing law enforcement and motor vehicle licensing databases. The UC then confirmed that GUERRERO was the target who met with the UC and sold the UC the fentanyl.

13. In early September, 2019, law enforcement conducted surveillance of a suspicious vehicle as it traveled to a restaurant in Methuen, Massachusetts. Law enforcement followed the vehicle and later arrested the occupant for possession of 20 grams of fentanyl. The occupant ("CS#1") agreed to cooperate with law enforcement and stated that he/she had been purchasing multi-gram quantities of fentanyl regularly from a subject whom he/she knew as "Freddy Banks", known by law enforcement to be Doriel GUERRERO. CS#1 advised that he/she had purchased from Banks approximately ten times since the beginning of the summer 2019. CS#1 provided the newest number for Banks as 603-275-0504. CS#1 advised that Banks had reached out to him/her in late August, 2019, to provide him/her with the new number.

14. In early October 2019, CS#1, at the direction of law enforcement, made arrangements to meet with Banks (known by law enforcement to be GUERRERO) at a restaurant in Manchester, New Hampshire to purchase forty grams of fentanyl. A UC then drove CS#1 to the location and parked in the parking lot. Law enforcement observed a different Hispanic male subject exit the same gray Lexus and get into the backseat of the UC vehicle. This person was later identified as Joel ESPINOSA by his Massachusetts Driver's License. The UC observed ESPINOSA hand CS#1 a clear plastic bag containing a tan powdery substance in exchange for $1,000. ESPINOSA exited the undercover vehicle and returned to the Lexus. The Lexus then left the area and returned to Massachusetts. Law enforcement conducted a vehicle stop on the Lexus on Marston Street in Lawrence, Massachusetts. The operator of the vehicle, GUERRERO, and the passenger, ESPINOSA, were identified with their Massachusetts driver's licenses.

15. On October 16, 2019, the CS#1, at the direction of law enforcement, made arrangements with GUERRERO to purchase another 40 grams of fentanyl for $1,000. CS#1 advised GUERRERO that he/she was unable to attend the deal and would send his/her cousin "Ryan," the UC, instead. CS#1 then gave GUERRERO the UC's phone number, and the UC began corresponding with GUERRERO directly. The UC completed the transaction later that afternoon on Weare Street in Lawrence, Massachusetts. GUERRERO got into the vehicle with the UC and handed the UC approximately 40 grams of a white powdery substance in a clear plastic bag. GUERRERO then took the $1,000 payment and exited the vehicle.

16. On October 21, 2019, GUERRERO texted the UC again and said, "I got a new number bro." The UC asked what the number was and GUERRERO texted the UC from (603) 943-6875 and said, "Hey Ryan it's Freddy same my new number."

17.     In early November 2019, law enforcement, the UC made arrangements, via text message, with GUERRERO to purchase forty grams of fentanyl for one thousand dollars utilizing phone number 603-943-6875. GUERRERO directed the UC to the McDonald's at 147 Pelham Street in Methuen, Massachusetts.

18.     On November 22, 2019, law enforcement utilized a UC to make arrangements to purchase 150 grams (15 fingers) of fentanyl from GUERRERO using 603-943-6875. GUERRERO stated that the cost was $3,750.  GUERRERO directed the UC to 15 Granite Street in Methuen, MA.  The UC, under surveillance of law enforcement, drove to the area and stopped near 15 Granite Street.  GUERRERO told the UC via telephone to wait for "someone" to come to the vehicle.

19.     At that time, surveillance officers observed two male juveniles approaching the vehicle and began moving toward them.  Both juveniles identified the presence of law enforcement and briefly attempted to flee the scene but were quickly taken into custody. Juvenile #1 was found to be in possession of approximately 160 grams of suspected fentanyl in two clear plastic bags.  The juveniles were later transported to the local police station.

20.     Juvenile #1 explained to law enforcement, in sum and substance, that a Hispanic subject that he knew only as "D French" contacted them, fed them lunch, and offered to pay them $100 to bring the product to the location.  They agreed and were driven in a "black Lexus" to the area of Granite Street.  Juvenile #1 showed law enforcement his phone, which showed that he had most recently been in contact with a number saved in his phone as "D French" at (978) 327-1161.  A review of the recent call log showed several incoming and outgoing calls with D French.  At 12:45 P.M., the call log showed an outgoing call that lasted 46 seconds.  At 12:47 P.M., the call log showed an incoming call that lasted 13 seconds.  At 12:53 P.M., the call log

showed an outgoing call that lasted 50 seconds. And finally, the call log showed two missed calls after the time that Juvenile #1 had been taken into custody. Juvenile #1 stated that (978) 327-1161 was the number used to coordinate the narcotics transaction with D French. D French explained to the juveniles that he would drop them off and pick them up after the deal.

21. Law enforcement located a Facebook social media profile under the name "Dee French." The "Dee French" page depicts photos of GUERRERO, as opposed to the Freddy Banks page, which has no personal photos.

22. Based on my training, experience, and familiarity with this investigation, I believe that GUERRERO was simultaneously using at least two separate phone numbers, 603-943-6875 and 978-327-1161, to conduct compartmentalized aspects of his drug distribution operation. The requested historical location information is likely to aid in identifying locations recently frequented by GUERRERO, which will aid in locating GUERRERO to effectuate his arrest for the conduct described above.

23. In my training and experience, I have learned that T-Mobile is a company that provides cellular telephone access to the general public. I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate information about the locations of the cellular telephones to which they provide service, including cell-site data, also known as "tower/face information" or "cell tower/sector records." Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device.

Accordingly, cell-site data provides an approximate location of the cellular telephone but is typically less precise than other types of location information, such as E-911 Phase II data or Global Positioning Device ("GPS") data.

24. Based on my training and experience, I know that T-Mobile can collect cell-site data about the Target Cell Phone. I also know that wireless providers such as T-Mobile typically collect and retain cell-site data pertaining to cellular phones to which they provide service in their normal course of business in order to use this information for various business-related purposes.

### AUTHORIZATION REQUEST

25. Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c).

26. I further request that the Court direct T-Mobile to disclose to the government any information described in Attachment B that is within the possession, custody, or control of T-Mobile. Because the warrant will be served on T-Mobile, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

/s/ Matthew C. Boc
Matthew C. Boc
Special Agent
U.S. Drug Enforcement Administration

Subscribed and sworn to before me on December __10__, 2019.

_____
Hon. Andrea K. Johnstone
United States Magistrate Judge

## ATTACHMENT A

### Property to Be Searched

This warrant applies to records and information associated with the cellular telephone assigned call number (978) 327-1161, with International Mobile Subscriber Identity/Electronic Serial Number 310260956385010 ("the Account"), that are stored at premises controlled T-MOBILE ("the Provider"), headquartered in Bellevue, Washington.

## ATTACHMENT B

### Particular Things to be Seized

**I. Information to be Disclosed by the Provider**

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, including any information that has been deleted but is still available to the Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Provider is required to disclose to the government the following information pertaining to the Account listed in Attachment A for the time period November 1, 2019 to November 30, 2019:

    a.    The following information about the customers or subscribers of the Account:

        i.    Names (including subscriber names, user names, and screen names);

        ii.    Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

        iii.    Local and long distance telephone connection records;

        iv.    Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

        v.    Length of service (including start date) and types of service utilized;

        vi.    Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number

("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

   vii.   Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address); and

   viii.   Means and source of payment for such service (including any credit card or bank account number) and billing records.

   b.   All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the Account, including:

   i.   the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses); and

   ii.   information regarding the cell tower and antenna face (also known as "sectors") through which the communications were sent and.

**II. Information to be Seized by the Government**

All information described above in Section I that constitutes [evidence, fruits, contraband, and instrumentalities] of violations of 21 U.S.C. § 841(a)(1) involving **Doriel GUERRERO** during the period November 1, 2019 to November 30, 2019.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Provider in order to locate the things particularly described in this Warrant.

# **CERTIFICATE OF AUTHENTICITY OF DOMESTIC RECORDS PURSUANT TO FEDERAL RULES OF EVIDENCE 902(11) AND 902(13)**

I, _____, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct. I am employed by T-MOBILE, and my title is _____. I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved. I state that the records attached hereto are true duplicates of the original records in the custody of T-MOBILE. The attached records consist of _____ **[GENERALLY DESCRIBE RECORDS (pages/CDs/megabytes)]**. I further state that:

a. all records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of T-MOBILE, and they were made by T-MOBILE as a regular practice; and

b. such records were generated by T-MOBILE's electronic process or system that produces an accurate result, to wit:

1. the records were copied from electronic device(s), storage medium(s), or file(s) in the custody of T-MOBILE in a manner to ensure that they are true duplicates of the original records; and

2. the process or system is regularly verified by T-MOBILE, and at all times pertinent to the records certified here the process and system functioned properly and normally.

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.

_____   _____
Date                             Signature